# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SHERYL RAJEAN YOUNG,      )
     )
        **Plaintiff,**      )
     )   **CIVIL ACTION**
**v.**      )
     )   **No. 16-1291-JWL**
NANCY A. BERRYHILL,[1]      )
**Acting Commissioner of Social Security,**      )
     )
        **Defendant.**      )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance benefits (DIB) and Supplemental Security Income (SSI) benefits under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the final decision of the Commissioner.

## I. Background

---

[1]On Jan. 20, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ms. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant. In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

Plaintiff applied for DIB and SSI benefits, alleging disability beginning August 13, 2012. (R. 192, 358). Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits. She argues that the ALJ erred at step three in finding that Plaintiff's condition does not meet or medically equal Listing 12.05C for intellectual disability, and also erred in numerous respects in assessing the opinion evidence and Plaintiff's allegations of symptoms.

The court's review is guided by the Act. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). Section 405(g) provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court determines whether the ALJ's factual findings are supported by substantial evidence and whether he applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record,

2

nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988)).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any listed impairment.  20 C.F.R., Pt. 404, Subpt. P, App. 1; Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform her

past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work. Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court finds no error as alleged by Plaintiff. It addresses the alleged errors in the order presented in Plaintiff's Brief.

## II.     Step Three, Listing 12.05C

Plaintiff claims that the ALJ erred in evaluating Listing 12.05C (Intellectual Disability) at step three of the sequential evaluation process. She argues that the ALJ erroneously relied on the Diagnostic and Statistical Manual of Mental Disorders (DSM) in finding that her condition does not meet Listing 12.05C, that a long history of employment in a semiskilled job does not preclude later meeting the Listing, that record evidence shows deficits in adaptive functioning manifested during the developmental period, that the ALJ acknowledged a Full Scale IQ score of 65, that a claimant's additional physical or mental impairment need not be independently disabling, and that the ALJ failed to consider whether Plaintiff's condition medically equaled the Listing.

The Commissioner argues that the ALJ reasonably found that Plaintiff's condition does not meet Listing 12.05C because she does not have the required deficits in adaptive functioning. She points to Dr. Steffan's diagnosis of borderline intellectual functioning because Plaintiff did not have deficits in adaptive functioning and to the fact that all treatment providers diagnosed borderline intellectual functioning rather than intellectual disability or mild mental retardation, as support for the ALJ's finding, and argues that even if the ALJ erred in relying on Dr. Whitten's estimated IQ of 70, the lack of deficits in adaptive functioning alone was sufficient to demonstrate the Listing is not met. Finally, she argues that the state agency psychological consultants found Plaintiff's condition does not medically equal a Listing and Plaintiff "makes no plausible argument as to how her impairments equal Listing 12.05C.

### A.    Step Three Standard for Evaluating Listing 12.05C

The "Listing of Impairments" describes the severity of certain impairments that the Commissioner considers disabling. 20 C.F.R. §§ 404.1525(a), 416.925(a); see also, 20 C.F.R., Pt. 404, Subpt. P, App. 1. If a claimant's condition meets or medically equals the severity of a listed impairment, her impairment is conclusively presumed disabling. Williams, 844 F.2d at 751; see Bowen v. Yuckert, 482 U.S. 137, 141 (1987) (if an impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled"). However, Plaintiff "has the burden at step three of demonstrating, through medical evidence, that h[er] impairments 'meet all of the specified medical criteria' contained in a particular listing." Riddle v. Halter, No. 00-

5

7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting <u>Sullivan v. Zebley</u>, 493

U.S. 521, 530 (1990) (emphasis in <u>Zebley</u>)).

 "The [Commissioner] explicitly has set the medical criteria defining the listed

impairments at a higher level of severity than the statutory standard.  The listings define

impairments that would prevent an adult, regardless of h[er] age, education, or work

experience, from performing <u>any</u> gainful activity, not just 'substantial gainful activity.'"

<u>Zebley</u>, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)).

The Listings "streamlin[e] the decision process by identifying those claimants whose

medical impairments are so severe that it is likely they would be found disabled

regardless of their vocational background." <u>Yuckert</u>, 482 U.S. at 153.  "Because the

Listings, if met, operate to cut off further detailed inquiry, they should not be read

expansively." <u>Caviness v. Apfel</u>, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

 Listing 12.05 provides in relevant part:

 Intellectual disability refers to significantly subaverage general intellectual
 functioning with deficits in adaptive functioning initially manifested during
 the developmental period:  <u>i.e.</u>, the evidence demonstrates or supports onset
 of the impairment before age 22.

 The required level of severity for this disorder is met when the requirements
 in A, B, C, or D are satisfied.

 * * *

 C. A valid verbal, performance, or full scale IQ of 60 through 70 and a
  physical or other mental impairment imposing an additional and significant
  work-related limitation of function;

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.05.

Listing 12.05 is somewhat different than the other listings for mental disorders. Id., § 12.00A. That Listing contains a diagnostic description of intellectual disability (introductory paragraph) and four sets of criteria describing listing-level severity (Paragraphs A through D). 20 C.F.R., Pt. 404, Subpt. P, App. 1 §§ 12.00A, 12.05(A-D). Paragraphs A through D provide four distinct and independent ways in which an individual having significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period might satisfy the criteria of Listing 12.05. Id.; McKown v. Shalala, No. 93-7000, 1993 WL 335788, *1 (10th Cir. Aug. 26, 1993) (decided when the Listing terminology used "mental retardation"). To meet the listing, a claimant must show that her condition satisfies both the diagnostic description of intellectual disability and any one of the four severity criteria. Id., § 12.00A.

If a claimant has an additional physical or mental impairment(s) which is "severe" within the meaning of 20 C.F.R. §§ 404.1520(c), 416.920(c), it will be considered to impose an additional and significant work-related limitation of function satisfying the third criterion of Listing 12.05C. 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(A); see also, Hinkle v. Apfel, 132 F.3d 1349, 1352-53 (10th Cir. 1997) (reaching the same conclusion before the regulations were changed in 2000 to specify the equivalence between "severe" impairments and "additional and significant work-related limitation of function."). Based upon the principles discussed above, to meet Listing 12.05C, a claimant must show that certain criteria are met: (1) evidence of onset of intellectual

disability before age twenty-two (deficits in adaptive functioning initially manifested during the developmental period), (2) a valid IQ score of 60 through 70 , and (3) a severe physical or mental impairment in addition to the alleged intellectual disability.

**B.    Analysis**

Here, the ALJ found that Plaintiff has severe impairments of major depression and anxiety, thereby satisfying criterion number three above.  (R. 195).  And, criterion number two was met when the ALJ found that Plaintiff "does have a full scale IQ of 65." Id. at 197.  The only remaining question is whether Plaintiff has provided evidence of deficits in adaptive functioning initially manifested before age twenty-two.

In that regard, the ALJ discussed the evidence and noted:

> The claimant has a long history of full-time employment as a janitor, which is rated as a semiskilled job in the Dictionary of Occupational Titles.  In addition, her treatment records and daily activities do not suggest any problems with adaptive functioning, even after the alleged onset date. Moreover, another provider opined that her IQ is above 70, suggesting her presentation is not suggestive of a listing level impairment in this area (Exhibit 9F, p.3 [(R. 709)]).  As a result, despite her low IQ scores, listing 12.05 does not appear applicable.

(R. 197).  It is clear from this discussion that the ALJ found Plaintiff's condition does not meet or equal Listing 12.05 (A, B, C, or D) because it does not meet the diagnostic description of intellectual disability contained in the introductory paragraph of the Listing.  Thereby he found that the first criterion of Listing 12.05C is not met.

Plaintiff's assertion that the ALJ erroneously applied the DSM misapprehends the decision.  The ALJ merely summarized the DSM's criteria for diagnosing intellectual

disability--"deficits in intellectual functioning, deficits in adaptive functioning, and onset of the intellectual and adaptive deficits during the developmental period"--and noted the results of such adaptive deficits:

> failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

(R. 197). Unlike in Barker v. Barnhart, Civ. A. No. 02-1442-MLB, slip op. rec. and report, at 18 (D. Kan. 2004), cited by Plaintiff, here the Commissioner does not argue that a claimant has to be limited in a particular number of adaptive skill areas to meet the deficits in adaptive functioning required by the diagnostic description of intellectual disability, and the ALJ did not apply such a requirement from the DSM. Rather, he looked to the Listing in light of the psychological standard presented in DSM-V to determine whether the Listing criteria were met or equaled. And, the ALJ in his decision cited DSM-V, not DSM-IV considered by the court in Barker. Moreover, the Barker decision is not precedent binding on this court.

Plaintiff's next argument (that Plaintiff's past performance of semiskilled work does not establish that the Listing is not met or equaled) also misapprehends the decision. The ALJ did not find that Plaintiff's past semiskilled work demonstrates that the Listing is not met or equaled. Rather, he found that Plaintiff's past semiskilled work suggests that Plaintiff did not have deficits in adaptive functioning initially manifested in the developmental period (before age 22). While the Commissioner argued in Barker that

past semiskilled work demonstrated that the claimant did not have intellectual disability, that court found record evidence of deficits in adaptive functioning during the developmental period. <u>Barker</u>, <u>slip op.</u> at 16-17. Here, the ALJ found no deficits in adaptive functioning during the developmental period (or "even after the alleged onset date"), and the question here is whether that finding is supported by the record evidence.

Next, Plaintiff argues that deficits in adaptive functioning are shown by the facts that Plaintiff was in special education in school and had tried regular classes but could not keep up, was described as obviously developmentally challenged, could be quarrelsome and negative, did not handle stress well, did not handle changes in routine well, was angry a lot, and had unrealistic ideas about relating to other people. (Pl. Br. 8-9) (citing to various points in the record evidence). Even accepting each fact cited by Plaintiff, she has not demonstrated that these facts establish deficits in adaptive functioning manifested during the developmental period. These facts are presented in the record evidence which has been variously created, considered, and/or reviewed by numerous mental healthcare practitioners. And the Commissioner argues that those practitioners diagnosed Plaintiff with borderline intellectual functioning, not intellectual disability, and none opined that Plaintiff has deficits in adaptive functioning manifested during the developmental period.

The Commissioner's argument is correct with one exception. On April 18, 2012 Plaintiff presented at the emergency room complaining of depression and anxiety. (R. 535). She had been tearful that day at work, so she left work and "came to the hospital so she wouldn't get fired." (R. 539). Plaintiff told the emergency staff that she had been

seen at Cowley County Mental Health for many years and was in special education in high school.  Id.  The attending and supervising physicians (the visit was at the KU School of Medicine) provided a "rule out" diagnosis of "mild mental retardation."  (R. 541).  The ALJ recognized this visit and diagnosis and noted that it occurred "prior to the alleged onset date."  (R. 199).  In the very next paragraph, the ALJ noted Plaintiff's long-term treatment at Cowley County Mental Health, that they had diagnosed her with borderline intellectual functioning, and that in January, 2011 her therapist had reminded her that she had been able to function and hold down a job for the last 12 years.  (R. 199) (citing Ex. 2F, p.35 (R. 576)).

Although the rule out diagnosis of mild mental retardation implies that Plaintiff may have had deficits in adaptive functioning manifest during the developmental period, no mental healthcare practitioner who was aware of Plaintiff's long-term treatment record expressed such an opinion, or diagnosed Plaintiff with intellectual disability or mild mental retardation.  Even Ms. Knoles, the social worker who treated Plaintiff and opined that she was markedly limited in every mental functional ability, diagnosed borderline intellectual functioning, not intellectual disability or mild mental retardation, and did not opine that Plaintiff had deficits in adaptive functioning manifested during the developmental period.  (R. 738-42).

In her next argument regarding Listing 12.05C Plaintiff objects to the ALJ's reliance on Dr. Whitten's opinion that Plaintiff's IQ is above 70.  (Pl. Br. 9-13).  This argument is likewise unavailing.  The record reveals that Dr. Whitten diagnosed Plaintiff

with borderline intellectual functioning and although he did not have access to an IQ test for Plaintiff he estimated her IQ on two different occasions to be "probably somewhere between 70 and 80" (R. 709), or "70 plus or minus 10." (R. 711). As quoted above, the ALJ relied on Dr. Whitten's opinion as "suggesting [Plaintiff's] presentation is not suggestive of a listing level impairment in this area." (R. 197). This reliance was not used to show, as Plaintiff suggests, that the tested IQ score of 65 was invalid (the ALJ had already accepted that score), or to show a conflict in the IQ evidence (his acceptance of the score of 65 had resolved any such conflict in Plaintiff's favor). Rather, Dr. Whitten's opinion was another factor relied upon by the ALJ to support his determination that the evidence of Plaintiff's presentation does not show deficits in adaptive functioning initially manifested during the developmental period. Because, as the ALJ found, the evidence does not establish the criteria of the introductory paragraph of Listing 12.05, "[L]isting 12.05 does not appear applicable." (R. 197).

Plaintiff's last argument in this regard is that "the ALJ should have considered whether [Plaintiff] equaled the severity of Listing 12.05C." (Pl. Br. 13). But, the ALJ considered this question and specifically found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (R. 195) (bolding omitted, emphasis added). While the ALJ did not state specific facts which do not equal Listing 12.05C, such an attempt to prove a negative would involve discussing each piece of evidence to state that it does not equal the severity of deficits in adaptive functioning initially manifested during the

developmental period. Such a proposition would be prohibitively time-consuming in the millions of Social Security cases adjudicated by the Commissioner each year. And, the burden is on Plaintiff at step three to prove that her condition is medically equal to Listing 12.05C. As the Commissioner points out, Plaintiff points to no evidence that her condition medically equals the criteria of the Listing. Plaintiff has shown no error.

## III.   Credibility Determination

The ALJ explained the law regarding consideration of a claimant's allegations of symptoms, and how he must consider the evidence and reports regarding those symptoms. (R. 198) (citing 20 C.F.R. §§ 404.1529 and 416.929; and Soc. Sec. Rulings (SSR) 96-4p and 96-7p). The ALJ did "not find the claimant's subjective complaints credible" (R. 199) because her statements regarding her job "raise some question about whether she stopped working" merely because she disliked her job, she had been able to work for 12 years despite her symptoms, Plaintiff's treatment notes and medical records do not suggest disabling symptoms as Plaintiff alleges (R. 198), and there is no indication in the medical records that the symptoms worsened at the alleged onset date. (R. 199).

Plaintiff claims error in the ALJ's credibility finding. She argues that the ALJ's statement (that Plaintiff's statements regarding her job raise some questions) is merely speculation which cannot be affirmed by the court, the ALJ did not "explain the basis of his speculative characterization" (Pl. Br. 16), the treatment record cited was not interpreted by the healthcare providers to support the ALJ's speculation, and the ALJ's characterization constitutes the ALJ's own psychiatric judgement wherein he overstepped

his bounds into the province of medicine, and on which the ALJ is not permitted to rely. Id. at 17-18 (citing, among others, Miller v. Chater, 99 F.3d 972, 977 (10th Cir. 1996), and Winfrey v. Chater, 92 F.3d 1017, 1022 (10th Cir. 1996)).  She also argues that the ALJ erred in discounting Plaintiff's allegations because she had worked in the past with her impairments.  She cites to record evidence of her treatment and her reports of symptoms to treatment providers and argues that she was struggling to keep her job, and the evidence shows worsening of her condition leading up to her alleged onset date, but that the ALJ denied worsening and did not explain how this evidence of such a struggle supported his rationale.  (Pl. Br. 19-27).

The Commissioner argues that the ALJ reasonably discounted Plaintiff's allegations of symptoms.  She points to evidence relied upon by the ALJ and argues that this evidence supports the determination.  (Comm'r Br. 8-9).  She argues that "Plaintiff essentially asks this court to view the evidence differently, in a way that supports her" allegations.  Id. at 10.  She argues that the court "may not displace the agenc[y's] choice between two fairly conflicting views" of the evidence.  Id.  In her Reply Brief, Plaintiff reiterates her arguments, and "disagree[s] with the agency's assertion that [she] is asking this court to view the evidence differently," but argues that she "is asking the court to enforce the requirement that the ALJ make proper findings based on a proper consideration of the record as a whole."  (Reply 11-12).

The court's review of an ALJ's credibility determination is deferential.  It is generally treated as binding on review.  Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir.

14

1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173. Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" Wilson, 602 F.3d at 1144 (quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)); Hackett, 395 F.3d at 1173 (same).

Here, the ALJ applied the correct standard, and his findings are closely and affirmatively linked to the record evidence. The court does not understand the ALJ's discussion of Plaintiff's statements that she hated her job, she felt like she had to do everyone's work, and that she had too much to do, as mere speculation. As the ALJ cited, the record supports that Plaintiff actually made these statements. (R. 543). And, as the ALJ also noted, such statements suggest that Plaintiff may have stopped working merely because she disliked her job, not because she was disabled and unable to work. While it is impossible for the ALJ to know with absolute certainty Plaintiff's motivation, it his duty to consider all of the evidence in evaluating Plaintiff's allegations of disabling symptoms. Plaintiff's statements are relevant in that regard, and it is not mere speculation to rely upon them in addition to other factors in discounting her allegations. That the mental healthcare providers who reported Plaintiff's statements did not state that they

15

interpreted the statements as did the ALJ is unremarkable because they were considering them in a context entirely different than the ALJ. Moreover, the ALJ was not substituting his medical (psychological) judgment for that of a mental healthcare provider. The providers whose treatment note the ALJ cited were not asked to, and did not, render a medical judgment regarding whether Plaintiff, a month later, would leave her job because she was disabled and unable to work, or because she hated her job.

Plaintiff's argument (that her symptoms had in fact worsened in the period leading up to her quitting her job) fares no better. That argument is not supported by the record evidence. The ALJ specifically cited the therapist's note that Plaintiff had been able to function and hold down a job for 12 years despite her condition. (R. 199) (citing Ex. 2F, p.35 (R. 576)). The ALJ noted that "on at least one occasion, the claimant was using her depression and anxiety for attention." (R. 199) (citing Ex. 2F, p.73 (R. 614) (Patient "reported . . . she was using her anxiety and depression for attention")). Moreover, the very earliest treatment records in the record, from October 2010 through January 2011 reveal the same symptoms as revealed in the records when Plaintiff quit working and shortly before. (R. 557) (October 22, 2010) (no energy, called in sick to work and warned, irritable and abusive to partner who moved out because of it); (R. 553) (November 16, 2010) ("I want to sleep all the time, I have no energy. I have called in sick to work so many times that I have been warned. I have no interest in doing things. I worry a lot. I have had depression off and on and it usually gets worse this time of year and I get irritable." "Her partner moved out one year ago due to her irritability and

anger."); (R. 569) (November 8, 2010) (Missed work Thursday, Friday last week); <u>see also</u> (R. 570, 574, 576).

After explaining her objections to the ALJ's weighing of the opinion evidence, Plaintiff returned to her credibility argument and argued that the ALJ ignored three factors which are supportive of her credibility--that none of her doctors thought she was exaggerating or malingering, that she kept trying to work, and that she continually sought mental health treatment. (Pl. Br. 38-39). Plaintiff fails to show that the ALJ ignored these factors. First, she cites no treatment record or opinion of a treating provider that opined that Plaintiff was not exaggerating or malingering. Perhaps Plaintiff is relying on the absence of a treatment provider's statement that she was exaggerating or malingering, but the absence of such a statement is not an evidentiary "fact" in the record of which the ALJ must take notice, and Plaintiff provides no authority otherwise. Second, with regard to Plaintiff's work history and treatment history, it is clear that the ALJ did not ignore those facts, because he summarized each one in his decision. The court does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, that is sufficient. <u>Qualls v. Apfel</u>, 206 F.3d 1368, 1372 (10th Cir. 2000). Giving the ALJ's credibility determination due deference, the court finds no error.

## IV. Opinion Evidence

Plaintiff claims error in the ALJ's evaluation of virtually every opinion in the record--medical opinion, "other" medical source opinion, and lay opinion alike. (Pl. Br.

27-38).  The Commissioner responds that the ALJ reasonably and properly considered all of the opinion evidence.

## A.    Standard for Evaluating Opinion Evidence

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources[2] that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations. Id. §§ 404.1527(c), 416.927(c) (effective March 26, 2012); SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2017).  A physician or psychologist who has treated a patient frequently over an extended period of time (a treating source) is expected to have greater insight into the patient's medical condition, and his opinion is generally entitled to "particular weight."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003). But, "the opinion of an examining physician [(a nontreating source)] who only saw the

---

[2]The regulations define three types of "acceptable medical sources:"

"Treating source:"  an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.
"Nontreating source:"  an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.
"Nonexamining source:"  an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion." Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)). However, opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2017) ("Giving Controlling Weight to Treating Source Medical Opinions").

The Tenth Circuit has explained the nature of the inquiry regarding a treating source's medical opinion. Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (citing SSR 96-2p). The ALJ first determines "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" Id. at 1300 (quoting SSR 96-2p). If the opinion is well-supported, the ALJ must confirm that the opinion is

also consistent with other substantial evidence in the record.  Id.  "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  Id.

If the treating source opinion is not given controlling weight, the inquiry does not end.  Id.  A treating source opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  Id.  Those factors are:  (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Id. at 1301; 20 C.F.R. §§ 404.1527(c)(2-6), 416.927(c)(2-6); see also Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)).

The ALJ must give reasons in the decision for the weight he gives the opinion.  Id. 350 F.3d at 1301.  "Finally, if the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so."  Id.  (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996) (quoting Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987)).

Applying the regulations, a therapist or social worker is an "other" medical source, not an "acceptable medical source" or a "treating source."  20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  Such a practitioner's opinion is not, strictly speaking, a "medical

opinion," and is never entitled to controlling weight.  Recognizing the reality that an

increasing number of claimants have their medical care provided by health care providers

who are not "acceptable medical sources"--nurse practitioners, physician's assistants,

social workers, and therapists, the Commissioner promulgated Social Security Ruling

(SSR) 06-3p.  West's Soc. Sec. Reporting Serv., Rulings 327-34 (Supp. 2017).  In that

ruling, the Commissioner noted:

> With the growth of managed health care in recent years and the emphasis
> on containing medical costs, medical sources who are not "acceptable
> medical sources," such as nurse practitioners, physician assistants, and
> licensed clinical social workers, have increasingly assumed a greater
> percentage of the treatment and evaluation functions previously handled
> primarily by physicians and psychologists.  Opinions from these medical
> sources, who are not technically deemed "acceptable medical sources"
> under our rules, are important and should be evaluated on key issues such as
> impairment severity and functional effects, along with the other relevant
> evidence in the file.

Id. Rulings, 330-31.

SSR 06-3p explains that such opinions will be evaluated using the regulatory

factors for evaluating medical opinions; id. at 331-32 (citing 20 C.F.R. §§ 404.1527,

416.927); and explains that the ALJ "generally should explain the weight given to

opinions from these 'other sources,' or otherwise ensure that the discussion of the

evidence in the . . . decision allows a claimant or subsequent reviewer to follow the

adjudicator's reasoning, when such opinions may have an effect on the outcome of the

case."  Id. at 333; see also Frantz v. Astrue, 509 F.3d 1299, 1302 (10th Cir. 2007)

(remanding for consideration of a nurse-practitioner's opinions in light of SSR 06-3p).

SSR 06-3p also applies to non-medical sources who have not seen the claimant in their professional capacity, and explains how their opinions should be considered:

> In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

Id.

### B.    The ALJ's Consideration

Here, the ALJ stated that he had "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (R. 198). He then summarized the medical evidence and the opinions he weighed and explained the weight he accorded to each opinion. (R. 198-203).

The ALJ explained how he understood Dr. Steffan's opinion and that as he understood the opinion he was persuaded by it and accorded it preponderant weight. (R. 200). The ALJ considered two opinions from Ms. Knoles, the social worker who treated Plaintiff, and he accorded both opinions little weight because Ms. Knoles's treatment records did not support the first opinion, the impairments and symptoms upon which she relied to formulate her opinions were present, and Plaintiff worked with them, before her alleged onset date, Ms. Knoles "indicated [Plaintiff] was 'markedly' limited in every single functional area," such a circumstance "strain[s] credulity," and "the record actually indicates no apparent problem in some of these areas, such as in the ability to maintain

socially appropriate behavior and basic standards of neatness and cleanliness." (R. 201) (citing Ex. 11F, p.4-5 (R. 740-41)). The ALJ also discounted Ms. Knoles's opinion because her accompanying narrative suggests the "opinion is based in large part on the presence of certain diagnoses and the claimant's need for ongoing treatment, despite her prior ability to work with these same symptoms." Id. The ALJ weighed the non-examining source opinions of Dr. Adams and Dr. Schulman, who reviewed the medical evidence and offered their opinions at the initial and reconsideration levels, respectively. (R. 201-02) (citing Exs. 3A-6A (R. 248-307)). The ALJ accorded preponderant weight to these opinions, noting that the record evidence supported them.

The ALJ also summarized and explained the weight accorded to the non-medical source opinions of Ms. Donnelly, Plaintiff's former supervisor; Mr. Young, Plaintiff's father; and Ms. Chavers, Plaintiff's supervisor at her part-time job after her alleged onset date. (R. 202-03). The ALJ accorded little weight to Ms. Donnelly's opinion in the third party function report because she spends very little time with Plaintiff and only meets with her to discuss her problems. (R. 202). He accorded only some weight to the opinions expressed in Ms. Donnelly's employer questionnaire, noting that Plaintiff's dislike of her job made it unclear how much of her tearfulness at, and absences from, work was attributable to her impairments. (R. 202). The ALJ accorded Mr. Young's opinion only little weight because it was a lay opinion not based on medical factors, it did not outweigh the record medical evidence, and was based on Plaintiff's report that her fatigue and absences were due to medical problems. Id. Finally, he accorded only some

weight to the opinions expressed in the Work Activities Questionnaire completed by Ms. Chavers.  He did so because there is little evidence Plaintiff's impairments caused the problems alleged, and because in the circumstances the limitations assessed may be attributed to "only the amount of work she was willing to do."  (R. 203).

### C.    Analysis

Plaintiff's first claim of error in weighing the opinion evidence is that the ALJ did not consider Dr. Whitten's opinion that Plaintiff is "unable to work," that an ALJ is required to consider every medical opinion in the record, and that remand is required because of this error.  To be sure, Dr. Whitten is an acceptable medical source who treated Plaintiff two times, on May 10, 2013 (R. 709), and on August 2, 2013.  (R. 711). On May 10, 2013, Dr. Whitten recorded in the "Progress and Observation" section of his treatment note that Plaintiff "is a 49-year-old female who lives alone, who has been diagnosed borderline intellectual functioning and she is applying for Social Security because of that and she is unable to work."  (R. 709).  On August 2, he recorded in the "Mental Status Exam" section of that treatment note that Plaintiff "is unable to work, but she is eating well, sleeping well, living in her own home as provided by her father and has a friend staying with her.  Things seem to be stable."  (R. 711).  The court agrees with the Commissioner that the statement that Plaintiff is unable to work is not a true medical opinion at all, but is merely an off-the-cuff observation, and there is no indication of any medical consideration or judgment in reaching that conclusion.  There is no indication that this is anything more than a report of Plaintiff's statement to the physician.  To the

extent that it may be a true medical opinion, it is an opinion on an issue reserved to the Commissioner, and Dr. Whitten provided no rationale, basis, or justification for such a conclusion. There is no error in the ALJ's "oversight" of this "opinion."

Plaintiff makes three objections to the ALJ's consideration of Dr. Steffan's report of his consultative examination and psychological testing of Plaintiff. (Pl. Br. 27-32). First, she argues that it is error to rely on Dr. Steffan's diagnosis of borderline intellectual function because Dr. Steffan had only three "available sources of information," regarding potential deficits in adaptive functioning, indicating that the agency had restricted Dr. Steffan's access to information and erroneously relied on the opinion thus procured. Id. at 27-28. She argues that the ALJ erroneously interpreted Dr. Steffan's opinion regarding her ability to work and provides her view of the proper interpretation of Dr. Steffan's opinion. (Pl. Br. 28-31). Finally, she argues that Dr. Steffan opined that she should have only "minimal interpersonal interactions in a workplace," and that the ALJ's findings that Plaintiff "cannot work closely with the public and coworkers," but that she "can maintain adequate superficial contact with supervisors" (R. 197) (bolding omitted) "greatly exceed 'minimal interpersonal interactions in a workplace.'" (Pl. Br. 32) (quoting without citation R. 695).

The court finds no error. Plaintiff has not shown that the "sources of information" available to Dr. Steffan were insufficient for the ALJ to rely on his opinion regarding deficits in adaptive functioning. First, Dr. Steffan's report was dated December 11, 2012, and, as the ALJ stated at the hearing, "we have to assume he had everything up until

then." (R. 217). Plaintiff has not demonstrated otherwise. And, as the Commissioner points out in her Brief, Dr. Steffan knew Plaintiff had worked full-time for 15 years and lived alone. He knew she participated in special education, graduated from high school, and never lived in a group home or other structured residential setting, and he knew her activities of daily living as expressed in his report He performed a mental status exam and administered IQ testing. All of this is information which was available to Dr. Steffan and upon which he relied in preparing his report. (R. 692-95). Moreover, as discussed above, every medical care provider except in one incident in an emergency room visit diagnosed Plaintiff with borderline intellectual functioning and no one opined that she had deficits in adaptive functioning initially manifested during the developmental period.

Plaintiff's presentation of an alternative interpretation of Dr. Steffan's opinion regarding her ability to work, fares no better. As previously noted in this decision the court may not reweigh the evidence or substitute its judgment for that of the Commissioner, "even if the evidence preponderates against the [Commissioner's] decision." Bowling, 36 F.3d at 434; see also Bowman, 511 F.3d at 1272 (court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency"); accord, Hackett, 395 F.3d at 1172. The ALJ explained the reason for his interpretation of Dr. Steffan's opinion, the record evidence supports that interpretation, and it is a reasonable interpretation. Plaintiff has not shown that the evidence cannot support the ALJ's interpretation. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by

26

substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

Finally, the court does not agree that the interpersonal interaction limitations assessed by the ALJ exceed the limitations opined by Dr. Steffan. Plaintiff provides no authority for her argument beyond her personal belief and assertion. Moreover, the state agency psychological consultants, Drs. Adams and Schulman, reviewed Dr. Steffan's opinion, accorded it significant weight, and opined that Plaintiff would have difficulty working closely with the public and co-workers, but could maintain adequate superficial contact with supervisors. (R. 249, 256, 259, 264-65, 271, 274, 280-81, 286, 289, 295-96, 301, 304).

Plaintiff objects to the ALJ's evaluation of the opinions of Plaintiff's treating social worker, arguing that the ALJ did not consider certain evidence and overlooked certain factors relevant to the evaluation. The court has reviewed the evidence and finds no error in the ALJ's evaluation of Ms. Knoles's opinion. Notably, the court agrees that it strains credulity that Ms. Knoles found Plaintiff markedly limited in every single functional area. Plaintiff's assertion that the ALJ did not consider certain evidence is merely an assumption that because the ALJ did not discuss a particular fact, he did not consider it. The ALJ stated that he had considered the entire record in making his RFC

assessment (R. 197), and Plaintiff provides no reason to believe that is not true. Hackett, 395 F.3d at 1172-73 ("our general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter"). While Plaintiff believes the ALJ should have weighed the evidence differently and accorded greater weight to certain opinions in the record, she does not demonstrate that the evidence cannot support the ALJ's findings. As noted above, the court may not reweigh the evidence or substitute its judgment for that of the Commissioner.

Plaintiff's objection to the ALJ's evaluation of the opinions of Drs. Adams and Schulman rests on the facts that they are non-examining sources and that their opinions were based on a review of the record which occurred before Dr. Whitten "opined" that Plaintiff is unable to work, and before Ms. Knoles provided her opinions. While the opinions of treating and examining sources are generally considered worthy of greater weight than are the opinions of non-examining sources, that is not without exception, and the ALJ here explained his bases for according weight to each true medical source opinion and for discounting Ms. Knoles's opinion, those bases are supported by the record evidence, and Plaintiff has not demonstrated otherwise. And the fact that the consultants' opinions predated some of the medical evidence is of no import in this case. There is no requirement that the ALJ must consider the opinion of an agency consultant based on all of the record evidence. Rather, it is for the ALJ to consider all of the evidence and to assess an RFC based on that evidence. He did so here, and Plaintiff has not shown that the later-supplied evidence requires a different result.

28

Regarding the "other" non-medical source opinions of Ms. Donnelly, Mr. Young, and Ms. Chavers, the ALJ considered and discussed each of them, and explained the weight accorded them. That is more than is required in the Tenth Circuit. Blea, 466 F.3d at 915 (an ALJ is not required to make specific written findings regarding a third-party statement if the decision reflects that the ALJ considered it). Although Plaintiff clearly believes these opinions should have been accorded greater weight, as discussed repeatedly in this decision, where the record evidence supports the Commissioner's rationale, the court may not reweigh the evidence and substitute its judgment for that of the Commissioner.

Plaintiff has shown no error in the decision below.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated this 6th day of September 2017, at Kansas City, Kansas.


s:/ John W. Lungstrum                
**John W. Lungstrum**
**United States District Judge**